IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

STEPHEN SCOTT HOLT                                                                      PLAINTIFF

        v.                    Civil No. 2:10-CV-03044-JRM

MICHAEL J. ASTRUE, Commissioner of
Social Security Administration                                                          DEFENDANT

## MEMORANDUM OPINION

### I.   Factual and Procedural Background

Plaintiff, Stephen Scott Holt, appeals from the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his applications for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI"), pursuant to §§ 216(i) and 223 of Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423(d), and § 1602 of Title XVI, 42 U.S.C. § 1381a, respectively (collectively, "the Act").

Plaintiff protectively filed his DIB and SSI applications on May 7, 2007, alleging a disability onset date of April 29, 2007, due to seizures, strokes, heat intolerance, migraines, kidney disease, low potassium, chronic obstructive pulmonary disorder ("COPD"), hypertension, depression, anxiety, and memory loss. Tr. 67-70, 74, 126-128, 131-135, 155, 159. At the time of the onset date, Plaintiff was twenty nine years old with a ninth grade education. Tr. 24, 165, 199, 223, 235. He has past relevant work as a agricultural product sorter, poultry dressing worker, concrete plant laborer, poultry de-boner, lumber stacker, and fast food worker. Tr. 38-44.

Plaintiff's applications were denied at the initial and reconsideration levels. Tr. 87-93, 96-99. At Plaintiff's request, an administrative hearing was held on October 22, 2008. Tr. 19-66. Plaintiff

was present at this hearing and represented by counsel. The Administrative Law Judge ("ALJ") rendered an unfavorable decision on December 23, 2008, finding that Plaintiff was not disabled within the meaning of the Act because he was capable of performing one or more occupations existing in significant numbers in the national economy. Tr. 71-86. Subsequently, the Appeals Council denied Plaintiff's Request for Review on April 22, 2010, thus making the ALJ's decision the final decision of the Commissioner. Tr. 1-3. Plaintiff now seeks judicial review of that decision.

**II.    Medical History**

Plaintiff has a history of heat stroke, head trauma, seizures, and alcohol and nicotine abuse. Tr. 554-580. In November 1997, Plaintiff hit his head against a car door and presented to his primary care physician, Charles Klepper, M.D., with headaches. Tr. 541-553. A CT revealed a small low density lesion in the paraganglia area and internal capsule on the right. Tr. 547. However, the clinical significance of the lesion was unclear, and it appeared to be an old injury. Tr. 544. An electroencephalogram ("EEG") report showed no clear evidence of any focal or diffuse abnormalities. Tr. 533.

On June 22, 2001, Plaintiff was admitted to the hospital for hematemesis, heat prostration, and gastritis. Tr. 554-564. Gallbladder and abdominal ultrasounds yielded normal results. Tr. 555. Additionally, a chest x-ray was normal. Tr. 555. Plaintiff rapidly improved and was discharged the same day. Tr. 555.

On March 29, 2007, Plaintiff was taken to Lakeland Regional Health System after being involved in a car accident where he hit a tree and lost consciousness. Tr. 249-268. Plaintiff denied any recall of the events leading up to the accident. Tr. 249-268. X-rays of Plaintiff's cervical spine revealed no fractures or malalignments. Tr. 263, 430. CT imaging of Plaintiff's head revealed an

old lacunar infarct in the right caudate nucleus, but no evidence of an acute intracranial hemorrhage. Tr. 264, 431. Plaintiff denied drug or alcohol use, but tested presumptively positive for marijuana. Tr. 262, 428-429. He was assessed with a concussion with loss of consciousness. Tr. 252.

Two days later, on March 31, 2007, Plaintiff presented to Lakeland Regional with complaints of tongue swelling. Tr. 269-279. At this time, an EEG was ordered to rule out seizures. Tr. 275. Results were normal, with no evidence of diffuse or focal cerebral disturbance. Tr. 284-285, 432. No epileptiform activity, spells, or seizures were noted during the recording. Tr. 284, 432.

Plaintiff was admitted to Lakeland Regional from May 3, 2007, to May 5, 2007, after reportedly having a seizure. Tr. 286-327. Upon intake, Plaintiff admittedly drank three to four forty ounce beers per day, but, in an effort to "cut back," had not consumed alcohol in two days. Tr. 304-307. He also admittedly smoked one pack of cigarettes per day. Tr. 306. Blood testing revealed elevated liver function tests. Tr. 304, 317, 320. X-rays of Plaintiff's chest were negative. Tr. 322. Daniel H. Snyder, M.D., assessed Plaintiff with ethanol abuse with withdrawal seizure and mild COPD. Tr. 304. Dr. Snyder noted that Plaintiff's elevated liver function tests were probably secondary to alcoholic hepatitis. Tr. 307. He instructed Plaintiff to stop drinking and to refrain from driving for at least six months. Tr. 307. Additionally, Dr. Snyder prescribed Antabuse, Librium, and Advair, and referred Plaintiff to Shoreline Services for alcohol abuse treatment. Tr. 304-305.

On May 22, 2007, Plaintiff was admitted to Bronson Methodist Hospital with a diagnosis of aspiration pneumonia. Tr. 342-366. Initial x-rays, taken at South Haven Community Hospital, revealed evidence of pulmonary interstitial and alveolar edema. Tr. 356. He was also diagnosed with hypertension, bilateral lower extremity edema, and low potassium. Tr. 344-349. While in the hospital, Plaintiff developed respiratory failure, requiring ventilation support. Tr. 344. An

electrocardiogram ("ECG") yielded normal results. Tr. 348. An echocardiogram showed a mildly dilated left ventricle, but was otherwise normal. Tr. 354-355. A CT of Plaintiff's chest revealed bilateral mid-lung field air space disease, but no evidence of pulmonary embolism. Tr. 348. A venous ultrasound of Plaintiff's lower extremities revealed no evidence of deep venous thrombosis. Tr. 353. Plaintiff was treated with antibiotics and discharged on May 31, 2007, in stable condition. Tr. 344-345.

On June 11, 2007, Plaintiff saw Dr. Klepper with complaints of seizures. Tr. 398. He was not taking any medication for seizures at that time. Tr. 398. Dr. Klepper prescribed Lopressor for Plaintiff's hypertension and Librium for alcohol withdrawals. Tr. 398. He also referred Plaintiff to UAMS for a neurology consult. Tr. 398.

On July 25, 2007, Plaintiff presented to UAMS Neurology Clinic for evaluation of his seizures. Tr. 369–381. An MRI of Plaintiff's brain revealed a ventricular cystic cavity without any abnormal enhancement or signal abnormality suggestive of periventricular leukomalacia. Tr. 392. An EEG study was normal, with no epileptiform discharges seen. Tr. 393-394. On November 1, 2007, Plaintiff saw Naim Haddad, M.D. Tr. 493-514. Dr. Haddad prescribed Dilantin for seizures and instructed Plaintiff not to drive as a precaution. Tr. 497. Plaintiff went to routine follow-up appointments on November 8, 2007, and April 3, 2008. Tr. 490-492, 499-501. On April 3, 2008, Plaintiff reported no seizures since his last visit. Tr. 501.

On August 8, 2007, Steve Owens, an agency specialist, reviewed Plaintiff's medical records and determined that he had no exertional, postural, manipulative, visual, or communicative limitations, but must avoid even moderate exposure to hazards, such as machinery or heights, due to his history of seizures. Tr. 382-389. He found no other limitations. Tr. 382-389.

On September 11, 2007, Plaintiff saw Dr. Klepper with complaints of headaches. Tr. 398. Plaintiff reported being involved in an altercation with a jailor after being arrested for public intoxication. Tr. 398. A CT of Plaintiff's head revealed a low-density lesion adjacent to the caudate nucleus on the right, potentially related to a previous cerebrovascular infarction or previous trauma, which was consistent with a CAT scan of Plaintiff's head taken in 1997. Tr. 539-540, 541-547. No other abnormalities were noted. Tr. 539. Dr. Klepper advised Plaintiff of his relatively benign CT results and gave him a prescription for Etodolac for pain. Tr. 398. Plaintiff returned on February 11, 2008, with complaints of increasing headaches. Tr. 403. A CT of Plaintiff's brain showed a persistent area of encephalomalacia in the periventricular white matter on the right in the anterior limb of the internal capsule. Tr. 402. However, no acute abnormalities or changes were noted from the previous study. Tr. 402.

Dr. Klepper noted that Plaintiff's hypertension was poorly controlled, as he had not been taking his medications. Tr. 403. He prescribed Lopid, Metolazone, Hydroxyzine, Dilantin, HCTZ, and Metoprolol. Tr. 404. He also referred Plaintiff to a cardiologist for his blood pressure and a nephrologist due to increased creatinine and liver function levels. Tr. 399-404. On February 21, 2008, Plaintiff was prescribed Floricet for headaches. Tr. 551. On August 7, 2008, Dr. Klepper filled out disability paperwork for Plaintiff, noting that he "continues to be severely handicapped." Tr. 485.

In October 2007, Plaintiff began treatment at Ozark Counseling Services. Tr. 407-419. Plaintiff reported receiving three DWI charges and a public intoxication charge. Tr. 417. He reported drinking an average of six beers per night for the last fifteen years and was unable to "cut down." Tr 417. He received alcohol treatment at OMART for one month in 2000, but relapsed a

few days after being discharged.  Tr. 418.  He was also a member of Alcoholics Anonymous and had received outpatient rehabilitation services.  Tr. 418.  Plaintiff stated that he continued to drink "in order to feel happy."  Tr. 417.  At the time of evaluation, Plaintiff was taking Metoprolol for hypertension and Librium to control his anxiety and withdrawal effects.  Tr. 417.

      Upon examination, Plaintiff was alert and oriented times three.  Tr. 418.  He was cooperative, but indifferent.  Tr. 418.  Dr. Durand noted that Plaintiff's speech was somewhat slurred, but fluent.  Tr. 418.  His short and long-term memory were moderately impaired, and his concentration was mildly impaired.  Tr. 418.  He reported prior suicidal ideation, but denied any plan or intent.  Tr. 417.  He also reported paranoid thoughts, but denied the presence of auditory or visual hallucinations.  Tr. Tr. 417.  Plaintiff's thought processes were logical and goal-oriented, but with poor elaboration.  Tr. 418.  His mood was depressed and his affect was blunted, appropriate, and sad in quality.  Tr. 418.  His insight and judgment were poor and his impulse control was mildly impaired.  Tr. 418.  Dr. Durand estimated Plaintiff's intelligence to be within the average range.  Tr. 418.

      Dr. Durand diagnosed Plaintiff with alcohol dependence, with physiological dependence, and depressive disorder not otherwise specified, rule out alcohol induced mood disorder with depressive features and alcohol induced psychotic disorder with delusions.  Tr. 418.  He estimated Plaintiff's Global Assessment of Functioning ("GAF") score at 40.  Tr. 418.  He also ordered neuropsychological testing to rule out amnestic disorder and alcohol-induced amnestic disorder, and prescribed Mirtazapine for depression and Cambral to decrease alcohol cravings.  Tr. 419.  At that time, Plaintiff's prognosis was poor, due to poor insight and severe alcohol dependence.  Tr. 419.  Between December 2007 and February 2008, Plaintiff was prescribed various medications for sleep and anxiety, including Trazodone, Hydroxyzine, and Rozerem.  Tr. 414-416.  In a progress note,

Plaintiff was reportedly still drinking, although not as much. Tr. 413. His mood was better and he was noted to be less aggressive than before. Tr. 413.

Plaintiff received treatment at Ozark Counseling Services intermittently through September 2008. Tr. 407-419, 458-462, 487-488. Progress notes reveal that Plaintiff was non-compliant with therapy, although he reported reduced alcohol usage and compliance with his prescribed medication. Tr. 459. In July 2008, Plaintiff's estimated GAF score was 45. Tr. 460. At this time, Plaintiff still qualified for a diagnosis of major depression and alcohol dependence. Tr. 460.

On February 18, 2008, Plaintiff saw Ron Revard, M.D., at Harrison Cardiology Clinic. Tr. 405. Plaintiff admitted smoking half a pack of cigarettes per day for sixteen years. Tr. 405. He also admitted consuming between six and seven beers a night. Tr. 405. Upon examination, Plaintiff was neurologically intact. Tr. 405. Dr. Revard ordered an ECG, carotid and lower arterial scans, an echocardiogram, and a treadmill stress test. Tr. 405. Results of the echocardiogram and treadmill stress test were normal. Tr. 466-470. Similarly, results of a bilateral carotid duplex ultrasound were normal, showing no evidence of stenosis. Tr. 475. At the time of evaluation, Plaintiff was taking Dilantin, Metoprolol, Hydroxyzine, HCTZ, Gemfibrozil, Mirtazapine, and Campral. Tr. 471.

On April 9, 2008, Plaintiff saw Mony Fraer, M.D., at UAMS Nephrology Clinic for a renal evaluation. Tr. 515-538. Dr. Fraer noted that Plaintiff's increased creatinine levels were possibly medication-induced. Tr. 518. On April 16, 2008, Dr. Fraer noted that Plaintiff's creatinine was back to a baseline of 1.3, and he was discharged back to Dr. Klepper. Tr. 531, 538.

On August 4, 2008, Dr. Klepper completed a physical residual functional capacity ("RFC") assessment. Tr. 453-456. Dr. Klepper stated Plaintiff's diagnoses as renal failure, seizure disorder, and status post cerebrovascular accident ("CVA") with late effects. Tr. 453. He also noted that

Plaintiff suffered from depression and anxiety. Tr. 454. Dr. Klepper found that Plaintiff's symptoms would constantly interfere with his attention and concentration and that he was incapable of performing even "low stress" jobs. Tr. 454. Exertionally, Dr. Klepper found that Plaintiff could walk less than one block without rest or severe pain, sit for fifteen minutes at one time and stand for twenty minutes at one time, sit/stand/walk for less than two hours during an eight-hour workday, and would need to get up and walk every fifteen minutes for a total of fourteen minutes. Tr. 454-455. He also noted that Plaintiff would need a job where he could shift positions at will and would need to take unscheduled breaks every thirty minutes for a total of twenty minutes each. Tr. 455. Dr. Klepper found that Plaintiff could rarely carry less than ten pounds, and never more than ten pounds, could rarely look down, turn his head right or left or hold his head in a static position, and could only occasionally look up. Tr. 455. Additionally, he determined that Plaintiff could never stoop/bend, crouch/squat, or climb ladders or stairs, and could only occasionally twist. Tr. 456. He found significant limitations with regards to reaching, handling, and fingering. Tr. 456. Environmentally, Dr. Klepper found that Plaintiff would need to avoid temperature extremes and could have no exposure to dust. Tr. 456. Dr. Klepper gave Plaintiff a poor prognosis and estimated that he would miss more than four workdays per month. Tr. 453-456.

**III.   Applicable Law**

The Court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2003). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support a conclusion." *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)). In determining whether

evidence is substantial, the Court considers both evidence that detracts from the Commissioner's decision as well as evidence that supports it. *Craig v. Apfel*, 212 F.3d 433, 435-36 (8th Cir. 2000) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). If, after conducting this review, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Secretary's] findings," then the decision must be affirmed. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (quoting *Siemers v. Shalala*, 47 F.3d 299, 301 (8th Cir. 1995)).

To be eligible for disability insurance benefits, a claimant has the burden of establishing that he is unable to engage in any substantial gainful activity due to a medically determinable physical or mental impairment that has lasted, or can be expected to last, for no less than twelve months. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); 42 U.S.C. § 423(d)(1)(A). The Commissioner applies a five-step sequential evaluation process to all disability claims: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits his physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity ("RFC") to perform his past relevant work; and (5) if the claimant cannot perform his past work, the burden of production then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform given his age, education, and work experience. *Pearsall*, 274 F.3d at 1217; 20 C.F.R. § 404.1520(a), 416.920(a). If a claimant fails to meet the criteria at any step in the evaluation, the process ends and the claimant is deemed not disabled. *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004).

## IV.     Discussion

At step one, the ALJ determined Plaintiff had not engaged in substantial gainful activity at any point since April 29, 2007, the alleged onset date. Tr. 76. At step two, the ALJ found that Plaintiff suffered from seizure disorder, essential hypertension, headaches, status-post cerebrovascular accident, alcohol dependence, and anxiety disorder, all of which were considered severe impairments under the Act. Tr. 76-78. At step three, she determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. Tr. 78-79. At step four, the ALJ found that Plaintiff had the RFC to perform sedentary work, except that he could do no driving, secondary to seizures, could not climb scaffolds, ladders or ropes, or work at unprotected heights or around dangerous equipment/machinery. Tr. 79-84. Additionally, the ALJ found that secondary to fatigue and pain, Plaintiff could only occasionally climb ramps and stairs, stoop, bend, crouch, crawl, kneel and balance, and must avoid extreme heat. Tr. 79-84. Mentally, the ALJ determined Plaintiff could engage in work involving non-complex, simple instructions with little judgment, where work is routine, repetitive, and learned by rote with few variables, and where there is only superficial and incidental contact with the public and co-workers and the supervision is concrete, direct and specific. Tr. 79-84. Based on this RFC assessment, the ALJ determined that Plaintiff could not perform his past relevant work. Tr. 84.

After eliciting vocational expert testimony, the ALJ determined there were sedentary, unskilled jobs existing in significant numbers in the national economy that Plaintiff could perform, including representative occupations such as machine tender, of which there are 36,500 jobs nationally and 500 jobs locally, and assembler, of which there are 9,100 jobs nationally and 1,200 jobs locally. Tr. 85-86. Accordingly, the ALJ determined that Plaintiff had not been under a

disability, as defined by the Act, at any point from April 29, 2007, through December 23, 2008. Tr. 86.

On appeal, Plaintiff contends the ALJ erred by: (1) failing to afford proper weight to the opinions of his treating physicians; (2) failing to obtain additional evidence regarding his mental limitations; (3) failing to properly follow the regulations for considering drug and alcohol abuse; and (4) relying on an improper hypothetical response. *See* Pl.'s Br. 2-11.

Plaintiff argues that the ALJ failed to fully develop the record as to his mental impairments. *See* Pl.'s Br. 2-11. We agree. The ALJ has a duty to fully and fairly develop the record, even if a claimant is represented by counsel. *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998). "It is well-settled that the ALJ's duty to fully and fairly develop the record includes the responsibility of ensuring that the record includes evidence addressing the alleged impairments at issue from either a treating or examining physician. *Nevland v. Apfel,* 204 F.3d 853, 858 (8th Cir.2000) (holding that it was improper for an ALJ to rely on the opinions of reviewing physicians alone). While the Secretary is under no duty to go to inordinate lengths to develop a claimant's case, he must "make an investigation that is not wholly inadequate under the circumstances." *Battles v. Shalala*, 36 F.3d 43, 45 (8th Cir. 1994) (quoting *Miranda v. Secretary of Health, Educ. & Welfare*, 514 F.2d 996, 998 (1st Cir. 1975)). There is no bright-line test for determining when the Secretary has failed to adequately develop the record; the determination must be made on a case by case basis. *Battles*, 36 F.3d at 45 (quoting *Lashley v. Secretary of Health & Human Serv.,* 708 F.2d 1048, 1052 (6th Cir.1983)).

Under the circumstances of this case, the ALJ failed to fully develop the record with regard to Plaintiff's mental impairments. The record does not contain any mental RFC assessments from

any treating, consultative, or agency physicians. *DiMasse v. Barnhart*, 88 Fed. App. 956, 967 (8th Cir. 2004) (record contained no mental RFC assessment). Additionally, the ALJ does not expressly state what weight was given to the opinion of Plaintiff's treating psychiatrist, Dr. Durand. Tr. 82-84. Although the ALJ discussed Dr. Durand's findings, it appears that she simply disregarded those findings that would serve to negate her RFC determination. Specifically, the ALJ made the following observations:

> In fact, Dr. Durand noted on October 30, 2007, that while the claimant was indifferent during the interview, he was cooperative, he was alert and oriented times three, his speech was somewhat slurred but fluent and that his intelligence seemed to be within normal limits. Further, Dr. Durand noted that the claimant's thought process was logical and goal oriented but with poor elaboration.

Tr. 83. We fail to understand how these findings reflect upon Plaintiff's ability to meet the mental demands of full-time employment. Additionally, the ALJ failed to note that Dr. Durand consistently gave Plaintiff GAF ratings between 40-45 and gave him a poor prognosis, due to poor insight and severe alcohol dependence.[1] Tr. 418-419, 460. Moreover, Dr. Durand found that Plaintiff suffered from a "serious mental illness" with resulting functional impairment. Although this classification is not dispositive in terms of Plaintiff's ultimate disability under the Act, it should have put the ALJ on notice of the need to seek further clarification from Dr. Durand, or, alternatively, to order a consultative evaluation to determine how Plaintiff's mental impairments affect his occupational functioning. *See Haley v. Massanari*, 258 F.3d 742, 749 (8th Cir. 2001) (reversible error for ALJ not to order a consultative examination where such evaluation is necessary to make an informed decision); *Pratt v. Sullivan*, 956 F.2d 830, 834 (8th Cir. 1992) (per curiam) (reversible error for ALJ

---

[1] A GAF score of 31-40 indicates "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." A GAF score of 41-50 indicates "serious symptoms or any serious impairment in social, occupational, or school functioning." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 34 (4th ed., 2000).

to substitute his own conclusions for diagnosis of examining psychiatrist). For these reasons, remand is necessary for further development of Plaintiff's mental limitations.

Plaintiff's remaining arguments have no merit. The ALJ properly rejected Dr. Klepper's RFC assessment, as it was inconsistent with his own findings as well as the medical evidence of record. *Reed v. Barnhart*, 399 F.3d 917, 920-921 (8th Cir. 2005) ( A treating physician's evaluation may be disregarded where other medical assessments "are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."). Moreover, contrary to Plaintiff's assertion, the ALJ did not err in her treatment of Plaintiff's alcohol and substance abuse, as she did not find Plaintiff disabled under the initial five-step analysis. *Brueggemann v. Barnhart*, 348 F.3d 689, 694 (8th Cir. 2003) (ALJ must first reach disability determination without segregating any assumed effects of substance abuse disorders); 20 C.F.R. § 404.1535 (key factor is determining whether you *would still* be disabled if you stopped using drugs or alcohol) (emphasis added).

**V.     Conclusion:**

Accordingly, we conclude that the ALJ's decision is not supported by substantial evidence and should be reversed and remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g). On remand, the ALJ should seek clarification from Dr. Durand, Plaintiff's psychiatrist, concerning the impact of Plaintiff's mental limitations on his work-related abilities. If Dr. Durand cannot be contacted, then Plaintiff should be sent for a consultative examination. After a mental RFC assessment has been completed, the ALJ should reassess Plaintiff's RFC, based on all relevant evidence, including medical records, opinions of treating medical personnel, and Plaintiff's description of his own limitations. *Dunahoo v. Apfel*, 241 F.3d

1033, 1039 (8th Cir. 2001).

DATED this 4th day of April 2011.

/s/ J. Marschewski
HON. JAMES R. MARSCHEWSKI
CHIEF U.S. MAGISTRATE JUDGE